# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHOUA T. YANG,**

    **Plaintiff,**

    v.             Case No. 17-CV-603

**NANCY A. BERRYHILL,**

    **Defendant.**

## DECISION AND ORDER

## PROCEDURAL HISTORY

Plaintiff Choua T. Yang alleges she has been disabled since January 29, 2013, due to depression, anxiety, right hand injury, possible nerve damage to right arm, and trigger finger. (Tr. 79, 90.) In July 2012 she applied for disability insurance benefits. (Tr. 169-70.) After her application was denied initially (Tr. 78-88) and upon reconsideration (Tr. 89-103), a hearing was held before an administrative law judge (ALJ) on March 30, 2015 (Tr. 50-77). On July 10, 2015, the ALJ issued a written decision concluding Yang was not disabled. (Tr. 24-35.) The Appeals Council denied Yang's request for review on February 24, 2017. (Tr. 1-3.)

This action followed. All parties consented to the full jurisdiction of a magistrate judge (*see* ECF Nos. 4, 5), and the matter is now ready for resolution.

**ALJ'S DECISION**

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. The ALJ found that Yang "has not engaged in substantial gainful activity since January 29, 2013, the amended alleged disability onset date[.]" (Tr. 26.)

The analysis then proceeds to the second step, which considers whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). "In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an individual's ability to perform basic work activities." *Moore v. Colvin*, 743 F.3d 118, 1121 (7th Cir. 2014). The ALJ concluded that Yang has the following severe impairments: "anxiety, depression, right epicondylitis, and brachial neuritis[.]" (Tr. 26.)

At step three, the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.1526, 416.920(d) and 416.926) (called "the listings"). If the impairment or impairments meets or medically equals the criteria of a listing and also meets the

2

twelve-month duration requirement, 20 C.F.R. § 416.909, the claimant is disabled. If the claimant's impairment or combination of impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Yang "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 26.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the claimant's ability to perform both physical and mental work-related activities on a regular and continuing basis despite her impairments. *Moore*, 743 F.3d at 1121. In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1529, 416.929, SSR 96-4p. In other words, the RFC determination is a function by function assessment of the claimant's maximum work capability. *Elder v. Asture*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Yang has the RFC "to perform light work as defined in 20 CFR 404.1567(b) except no overhead reaching with the right upper extremity, frequent use of the right hand and upper extremity, simple, routine, and repetitive noncomplex work, and occasional interaction with the public and coworkers." (Tr. 28.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1526, 416.965. The ALJ found that Yang is capable of performing

3

her past relevant work as an electronics assembler, and as a result concluded that she is not disabled. (Tr. 34.)

Based on her decision at step four that Yang could perform past relevant work and is, therefore, not disabled, the ALJ did not conduct an analysis under step five.

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

It is not the court's role to reweigh evidence or substitute its judgment for that of the ALJ. *Moore*, 743 F.3d at 1121. Rather, the court must determine whether the ALJ complied with her obligation to build an "accurate and logical bridge" between the evidence and her conclusion that is sufficient to enable a court to review the administrative findings. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas*, 745 F.3d at 806. If the ALJ

committed a material error of law the court cannot affirm the ALJ's decision regardless of whether it is supported by substantial evidence. *Beardsley*, 758 F.3d at 837; *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

## ANALYSIS

Although she was previously represented by counsel, Yang is now representing herself. She argues that the ALJ erred in her RFC determination by (1) giving little weight to the opinions of treating Drs. Maritoni Abraham and Tracie Dunek, (2) giving little weight to Yang's GAF scores, and (3) only limiting Yang to no overhead reaching with right extremity and frequent use of her right hand and upper extremity. (ECF No. 25 at 1-2.) Yang also argues that the ALJ erred at step-four of the evaluation process by accepting the vocational expert's opinion that she could return to her past work as an electronics assembler. (*Id.* at 2-3.)

**I. RFC Assessment**

**A. Treating Source Opinions**

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, -- Fed. Appx. --, 2018 WL 3855017, at *3 (7th Cir. August 14, 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations

require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). "An ALJ must offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted).

### 1. Dr. Maritoni Abraham's Opinion

Yang argues that the ALJ erred by failing to give controlling weight to the opinion of her treating psychiatrist, Dr. Maritoni Abraham, M.D. (ECF No. 25 at 2.) On February 4, 2013, Dr. Abraham completed a mental impairment questionnaire which noted that an injury Yang suffered at work "triggered depression and anxiety." (Tr. 383.) Dr. Abraham opined that Yang had no useful ability to deal with the stress of semiskilled or unskilled work, interact appropriately with the general public, maintain socially appropriate behavior, use public transportation, understand and remember detailed instructions, carry out detailed instructions, or complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 381-82.) Dr. Abraham further opined that Yang had moderate restrictions in activities of daily living and in concentration, persistence or pace, marked limitations in social

functioning, and that Yang had experienced four or more episodes of decompensation. (Tr. 382.)

In discounting Dr. Abraham's opinion, the ALJ began by noting that, because they rested in part on Yang's right upper extremity condition, the opinions went outside Dr. Abraham's area of expertise. (Tr. 32.) The ALJ found Dr. Abraham's opinion "incongruent with the medical evidence of record and [Yang's] activities." (Tr. 33.) She stated that, "[w]hile the record documents persistent symptoms of depression and anxiety with contemporaneous findings of depressed or anxious mood on examination, the record also shows relatively good cognitive function[,]" with Yang maintaining eye contact, goal-directed and organized thought processes, clear and coherent speech, and intact memory. (*Id.*) The ALJ also found that Dr. Abraham's opinion that Yang experienced four or more episodes of decompensation, each of extended duration, was inconsistent with the record. (Tr. 382.)

Substantial evidence in the record supports the ALJ's reasons for discounting Dr. Abraham's opinion. Dr. Abraham treated Yang's mental illnesses, not her right upper extremity. Examinations in the record show "good cognitive function with maintained eye contact, goal-directed and organized thought processes, clear and coherent speech, and intact memory (*see* Tr. 337, 354, 397, 403, 406, 412, 594-95, 596-97, 599-601, 606-07), which undermines Dr. Abraham's finding that Yang has marked difficulties in maintaining social functioning. The record also shows only one inpatient treatment that

7

lasted one day, which undermines Dr. Abraham's finding that Yang has experienced four or more episodes of decompensation. (Tr. 441-409, 511-14.)

Although Yang argues that the ALJ "nitpick[ed] some choice words" from the record and did not understand the full picture of each visit (ECF No. 25 at 1), the ALJ adequately considered all relevant medical evidence in discounting Dr. Abraham's opinion. The ALJ considered that Yang (1) "has presented as depressed, tearful, despondent and/or anxious;" (2) "complains of symptoms of depressions and anxiety including disturbance in sleep and appetite, suicidal thoughts, crying spells, low energy, anhedonia, excessive worry, auditory hallucinations, and feelings of helplessness and worthlessness;" (3) "has a history of two suicide attempts;" (4) "has been diagnosed with major depression, chronic and moderate, and anxiety disorder;" and (5) "has required multiple modifications to her medication regimen and dosages." (Tr. 30.) The ALJ then considered that "her mental status examinations generally reflect intact cognitive function with some benefit from medication", and that she "has a history of non-compliance with her medication regime and her single hospitalization during the relevant period was brief, lasting one day." (*Id.*) This simply is not a case where the ALJ cherry-picked facts to support her conclusion.

The ALJ's opinion shows she considered all relevant medical evidence in her assessment of Dr. Abraham's opinion. Accordingly, the ALJ did not err by discounting Dr. Abraham's opinion.

### 2. Dr. Tracie Dunek's Opinion

Yang also argues that the ALJ erred in giving little weight to the opinion of her treating physician, Dr. Tracie Dunek, M.D. (ECF No. 25 at 2.) Dr. Dunek completed an RFC questionnaire on January 29, 2013. She stated that Yang suffered right arm pain and paresthesis and weakness. (Tr. 384.) Dr. Dunek reported that the "pain is located in the right arm, right shoulder, right cervical, thoracic region." (*Id.*) She stated that Yang's "severity of pain has been improved with pain medication, from 9--6/10," although "[h]er medications cause drowsiness." (*Id.*)

Dr. Dunek opined that Yang's symptoms would constantly interfere with her attention and concentration. (Tr. 385.) She opined that Yang was incapable of even "low stress" jobs, that she could sit and stand a maximum of one hour at a time, and that she would "hourly" need to take unscheduled breaks of 20 minutes in duration. (Tr. 385-86.) Dr. Dunek further opined that during an eight-hour workday Yang would only be able to use her right hands, fingers and arm three percent of the time, and her left hands, fingers and arms 66 percent of the time. (Tr. 387.) And she opined that Yang's impairments would cause her to be absent from work more than four days per month. (*Id.*)

In giving Dr. Dunek's opinion little weight, the ALJ found that it was inconsistent with the overall record. (Tr. 33.) The ALJ stated that the only physical impairments in the record relate to Yang's right upper extremity. According to the ALJ,

9

nothing in the record suggests an impairment to Yang's left upper extremity, spine, lower extremity or other body system "that would support Dr. Dunek's sitting, standing, walking, postural and left upper extremity limitations and need for a position change." (Tr. 33.) The ALJ also concluded that Dr. Dunek's opinion regarding Yang's inability to concentrate and handle stress "are contrary to the evidence showing intact cognitive function and her ability to engage in some basic daily activities such as use public transportation, drive, and chaperone church youth groups." (Tr. 33.) Moreover, the ALJ concluded that there is no evidence to support Dr. Dunek's opinion that Yang would need to miss work four or more days per month.

Yang contends that Dr. Dunek's opinion "speak[s] to the limitations caused in [her] dominant (right) upper extremity by [her] epicondylitis and brachial neuritis." (ECF No. 25 at 2.)

The court agrees with the ALJ's conclusions. No evidence in the record supports Dr. Dunek's opinion about the sitting, standing, walking, postural and left upper extremity limitations she identifies. Yang showed intact cognitive function upon examination (*see* Tr. 337, 354, 397, 403, 406, 412, 594-95, 596-97, 599-601, 606-07) and had the ability to engage in some basic daily activities that required concentration or an ability to handle stress (*see* Tr. 62-64, 193, 195-96, 214-16). And no evidence supports Dr. Dunek's opinion that Yang would need to miss work four or more days per month.

Accordingly, the ALJ did not err in giving little weight to Dr. Dunek's physical RFC questionnaire.

**B. GAF Scores**

Yang argues that the ALJ's decision to give little weight to the GAF scores assigned by her treating physicians violates SSR 96-7p because the severity of her symptoms "may not only vary week by week, but even hour by hour." (ECF No. 25 at 2.) SSR 96-7p cautions ALJs that "[s]ymptoms may vary in their intensity, persistence, and functional effect, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of [her] symptoms." As a result, ALJs "need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects." SSR 96-7p.

The ALJ gave little weight to the GAF scores for the exact reason Yang complains about: her symptoms varied over the course of time. The ALJ concluded that the GAF scores were "not a good indicator of [her] overall functioning during the time in question" because they represented a "snapshot in time" and only reflected her "functioning on the day of examination rather than over the course of time." (Tr. 34.) The ALJ further concluded that the GAF scores were unreliable because it is difficult to "draw reliable inferences from differences in GAF ratings assigned by different

clinicians," and Yang's "clinicians did not routinely note whether the GAF score reflected function, symptoms or both." (Tr. 34.)

The ALJ provided a sound basis for discounting the GAF scores. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [her] GAF score.") Specifically, the ALJ gave several reasons for concluding that the GAF scores are unreliable. As such, the ALJ properly considered the GAF scores and did not err when she gave them little weight.

### C. Symptom Evaluation

Pursuant to SSR 16-3p, the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3, at *2, *see also* 20 C.F.R. 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities…." SSR 16-3p, at *2.

The court reviews an ALJ's subjective symptom evaluation deferentially, reversing only if it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir.

2017). The critical question is whether the ALJ provided reasons, based on the record before her, to support her conclusion. *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). An ALJ is not required to "specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *see also Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that an ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability").

The ALJ found that Yang's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 29.) However, she found that Yang's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (*Id.*) As a result, the ALJ did not find credible Yang's testimony that the pain in her right shoulder and hand is work preclusive.

Yang argues that the ALJ's decision to limit her to only no overhead reaching with the upper right extremity and frequent use of the right hand and upper right extremity is "inconsistent with the medical records and testimony documenting the extent of [her] limitations of [her] right arm." (ECF No. 25 at 2.) Yang testified that part of the reason why she is unable to work is because the pain in her right shoulder and wrist is "always there" and "never goes away." (Tr. 61-62.)

In response, the Commissioner argues that the ALJ "considered the lack of medical evidence showing a worsened condition" and "reasonably relied on the opinions of the state agency medical consultants and their assessment of the medical

13

evidence." (ECF No. 26 at 7.) The Commissioner points out that Yang's injuries date back to 2002 and that she was still able to work until her job was outsourced in 2010. The Commissioner also alleges that Yang presents no evidence explaining why she suddenly became disabled in January 2013. (*Id.*)

Substantial evidence in the record supports the ALJ's conclusion to limit Yang to no overhead reaching with the right upper extremity due to the associated pain from her conditions and decreased range of motion. (Tr. 31.) In March 2015 an examination of Yang noted "[t]he right shoulder exam is normal with irritation to abduction *past* 90 [degrees]" and "no limitation of range of movement of any of the joints of the upper and lower extremities." (Tr. 463 (emphasis added).) Previous examinations of her right shoulder noted similar findings. (*See* Tr. 282, 284, 288, 297, 367.)

However, the ALJ did not provide any support for her conclusion that Yang is only limited to "frequent use of [her] right hand." Yang is right-handed. (Tr. 54.) She has complained of chronic right-hand pain (*see, e.g.*, Tr. 365, 412, 431, 462-63, 599) and testified that her right-hand pain is "always there" and "never goes away" (Tr. 61). A March 2015 examination noted "[mild] tenderness to palpation over the right wrist and generally over the hand," and that Yang's "right grip strength is weaker than her left." (Tr. 463.)

Given that the ALJ failed to provide any explanation for limiting Yang to "frequent use of [her] right hand," she failed to build a logical bridge between the

evidence in the record and her conclusion. On remand, the ALJ must evaluate the severity, persistence, and limiting effects of Yang's right-hand pain in light of the record evidence.

## II. Step-Four Conclusions

Yang also argues the ALJ erred in finding that she was able to return to her previous work as an electronics assembler. (ECF No. 25 at 2-3.) On remand, the ALJ shall also consider whether any further limitations related to Yang's right hand may impact her ability to return to her previous work. If the answer to that question is "yes," the ALJ should proceed to step five of the sequential evaluation process and determine whether Yang is able to do any other work considering her RFC, age, education and work experience.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 14th day of September, 2018.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge